## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**Case No.** 22-8336-BER

UNITED STATES OF AMERICA

v.

JOFF STENN WROY PHILOSSAINT,

**Defendant.**
_____/

## CRIMINAL COVER SHEET

1.  Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?   ___ Yes  ✔ No

2.  Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?   ___ Yes  ✔ No

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

BY: _____

A. Marie Villafaña
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No.    0018255
500 South Australian Avenue, Suite 400
West Palm Beach, Florida 33401
Tel:        (561) 820-8711
Fax:       (561) 820-8777
Email:    ann.marie.villafana@usdoj.gov

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. 22-8336-BER |
| JOFF STENN WROY PHILOSSAINT, | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ April 1, 2020-present _____ in the county of _ Palm Bch, Broward, Dade _ in the _____ Southern _____ District of _____ Florida _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to commit wire fraud |
| 18 U.S.C. § 1956(h) | Conspiracy to commit money laundering |
| 18 U.S.C. § 1028A | Aggravated identity theft |
| 18 U.S.C. § 1425 | Procurement of citizenship or naturalization unlawfully |

This criminal complaint is based on these facts:

**See Attached Affidavit**

FILED BY____ TM ____D.C.

Aug 5, 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Jon A. Longo, HSI
*Printed name and title*

Sworn and Attested to me by Applicant by Telephone (FaceTime) pursuant to Fed. R. Crim. P. 4(d) and 4.1

Date: 8/5/22

_____
*Judge's signature*

City and state: _____ West Palm Beach, FL _____

Bruce E. Reinhart, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Jon A. Longo, a Special Agent (SA) of the United States Department of Homeland Security, Homeland Security Investigations (HSI), Office of the Assistant Special Agent in Charge in West Palm Beach, Florida, being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.       I make this affidavit in support of a criminal complaint charging JOFF STENN WROY PHILOSSAINT ("PHILOSSAINT") with: conspiracy to commit wire fraud, conspiracy to commit money laundering, aggravated identity theft, and procurement of citizenship or naturalization unlawfully, in violation of 18 U.S.C. §§ 1349, 1956(h), 1028A, and 1425, from on or about April 1, 2020 through the present, in Palm Beach, Broward, Miami-Dade, and St. Lucie Counties, in the Southern District of Florida, and elsewhere.

2.       In summary, PHILOSSAINT and co-conspirators devised and participated in a scheme to obtain by fraud, millions of dollars in forgivable loans through the Paycheck Protection Program ("PPP") and the Economic Injury Disaster Loan ("EIDL") Program.  PHILOSSAINT and his co-conspirators obtained these loans both for PHILOSSAINT's own companies and co-conspirators' companies.  PHILOSSAINT conspired to submit a number of fraudulent loan applications for other business owners' companies in order to receive kickbacks from those approved and funded loans. To inflate the size of the loan amounts, the conspirators relied on a variety of false statements, including the number of employees, monthly payroll amounts, and gross revenues, and they submitted falsified tax documents in support of their loan applications. For example, the conspirators used nearly identical versions of the same fabricated tax documents in the PPP applications for multiple companies.  A number of these loans were approved and funded by financial institutions and the Small Business Administration ("SBA"), and certain

proceeds were transmitted to accounts controlled by PHILOSSAINT in the United States and in the Dominican Republic.

3.     I have been employed as a sworn federal Special Agent with Immigration and Customs Enforcement (ICE) since July 2006.  As a federal agent, I am authorized to investigate violations of laws of the United States, including those related to immigration and benefit fraud, and to execute warrants issued under the authority of the United States.  I have received 23 weeks of training at the Federal Law Enforcement Training Center, which included the application of federal statutes, federal court procedures, and the techniques required to insure the admissibility of evidence at trial.  I have also conducted and participated in investigations of this nature.

4.     Recently, I have been assigned to work with the Small Business Administration Office of Inspector General ("SBA-OIG") and other law enforcement partners, including the Federal Bureau of Investigation ("FBI"), Internal Revenue Service, Criminal Investigation ("IRS-CI"), and Secret Service ("USSS") to investigate PHILOSSAINT and others involved in possible fraud associated with the stimulus and economic assistance programs created by the federal government in response to the COVID-19 pandemic.

5.     The facts set forth in this affidavit are based upon my personal observations, my review of records obtained during the course of the investigation, my training and experience, and information I obtained from other law enforcement agents and government personnel.  Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not included in this affidavit every detail of the investigation.

**The Paycheck Protection Program ("PPP")**

6.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to

the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

7.      The types of businesses eligible for a loan included sole proprietorships.  In order to obtain a PPP loan, a qualifying business (through its authorized representative or the sole proprietor) signed and submitted a PPP loan application (Small Business Administration ("SBA") Form 2483) online through the lender's application platform.  The PPP loan application required the business (through its authorized representative or the sole proprietor) to acknowledge the program rules and make certain affirmative certifications, in order to be eligible to obtain the PPP loan.  The certifications included an attestation that the business was in operation on February 15, 2020, and had employees for whom it paid salaries and payroll taxes or paid independent contractors, or was a sole proprietorship with no employees.  In the PPP loan application, the small business (through its authorized representative or the sole proprietor) was required to provide, among other things, its average monthly payroll expenses and number of employees.  In addition, businesses applying for the PPP loan were required to provide documentation confirming their payroll expenses.  Typically, businesses supplied documents showing the amount of payroll taxes reported to the Internal Revenue Service ("IRS").  The sole proprietorship had to report and document the business' income and expenses, as typically reported to the IRS on Form 1040, Schedule C.  These figures and documentation were used to calculate the amount of money the small business was eligible to receive under the PPP.  Sole proprietorships were eligible to receive a maximum PPP loan of up to $20,833 to cover lost income.

8.      A PPP loan application was processed by a participating lender.  The SBA

delegated authority to third-party lenders to underwrite and approve the loans.  If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were 100% guaranteed by the SBA.  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted electronically by the lender to the SBA in the course of processing the loan.

9.     PPP loan proceeds were required to be used by the business on certain permissible expenses — payroll costs, interest on mortgages, rent, and utilities.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time and used a defined portion of the PPP loan proceeds on payroll expenses.

### The Economic Injury Disaster Loan ("EIDL") Program

10.     Before the COVID-19 pandemic, SBA's Economic Injury Disaster Loan ("EIDL") program provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

11.     The CARES Act also authorized the SBA to provide EIDL assistance to eligible small businesses experiencing "substantial economic injury" (substantial financial disruptions) due to the COVID-19 pandemic.  In order to obtain a COVID-19 EIDL, a qualifying business was required to submit electronically an EIDL application to the SBA and provide information about its operations, such as the number of employees, gross revenues, and the cost of goods sold for the 12-month period preceding January 31, 2020.  The applicant was also required to certify under penalty of perjury that all of the information in the EIDL application was true and correct to the best of the applicant's knowledge.

12.     EIDL applications were submitted directly to, and processed by, the SBA, with

support from a government contractor.  EIDL funds were issued directly from the United States Treasury.

13.     In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL.  The amount of the advance was determined by the number of employees the applicant certified having at the small business.  The advances did not have to be repaid.

14.     SBA's email and loan application servers are located outside the State of Florida, so wire communications between banks and the SBA and between EIDL applicants located within Florida and the SBA necessarily traveled in interstate commerce.

### *The Scheme to Obtain Fraudulent PPP and EIDL Loans*

15.     Beginning in March 2020, JOFF PHILOSSAINT ("PHILOSSAINT") and other co-conspirators devised a scheme to defraud the PPP and EIDL loan programs.  As noted above, in order to be eligible for a PPP or EIDL loan, one had to: (a) have an active business as of the start of the COVID-19 Pandemic; (b) have paid employees (with the exception of some sole proprietorship EIDLs); and (c) use the proceeds of the loans to continue to operate the business and continue paying its employees.  The crisis situation of the COVID-19 emergency meant that banks and the SBA had to rely on documentation provided by and sworn representations made by the applicants.   However, these eligibility requirements can be cross-checked against documentation that applicant provided – or failed to provide – to other government agencies at other times.  For example, regarding the first requirement, a review of Florida Department of State records shows that many of the business involved in PHILOSSAINT's scheme were "Inactive" as of January 1, 2020, and had been "Inactive" for several years for failure to file annual reports.  Those businesses were re-activated shortly before they filed for the PPP and EIDL loans.  And

with regard to the second and third requirements, wage and earnings records maintained by the Florida Department of Revenue – which oversees unemployment insurance – and records filed with the IRS showed that many of the businesses did not employ the individuals listed and did not have the revenues claimed on the loan applications.  Later, during the loan forgiveness phase of the PPP and EIDL programs, SBA requested specific IRS filings, and it was determined that PHILOSSAINT and his co-conspirators supplied different versions of those documents to the SBA than the ones provided to the IRS.  In addition, agents involved in the investigation have visited many of the registered addresses of the businesses that received loans and found no operating businesses.

     1.   Using ADP to Create False Payroll Records through Identity Theft

16.     To create the appearance of having many employees, PHILOSSAINT and his co-conspirators opened approximately 152 payroll processing accounts at ADP, a national payroll processing servicer.  Publicly available records disclosed that these 152 businesses were all funded with PPP and EIDL loans worth approximately $25 million.   Of these 152 businesses, approximately 26 were on-boarded through ELITE INTERNATIONAL FINANCIAL GROUP also known as the business entity ELITE INTERNATIONAL VENTURE CAPITAL ("EIVC"). PHILOSSAINT is the owner of EIVC and served as the primary payroll contact for each business on-boarded through EIVC.  The 26 businesses on-boarded through EIVC received approximately 33 PPP and EIDL loans totaling $4,878,481.

17.     In order to facilitate the scheme by making the businesses look legitimate and increasing the possibility of receiving large loans, PHILOSSAINT and co-conspirators prepared and submitted ADP payroll intake documents providing the means of identification of real individuals to use as purported employees, including their names, social security numbers, dates

of birth, and other personal identifying information.   Many of the employees listed by PHILOSSAINT's clients were friends or family members and had no record of receiving wages prior to or after receiving the loans.  Interviews have revealed that at least some of the "employees" had no knowledge that their personal information was being used in this way, and they have confirmed that they never worked for the businesses that were listing them as paid employees. Bank statements confirm that many of these individuals never received payroll payments from the businesses.   In many instances, the bank accounts to which the ADP payroll payments were directed did not, in fact, go to the named employees but, instead, went back to the owners of the businesses.

18.   Prior to applying for the PPP/EIDL loans, the businesses had not received ADP payroll services.  After receiving sufficient paystubs from ADP, the companies stopped paying their bills to ADP, and ADP closed the accounts.  When the time came to apply for loan forgiveness, PHILOSSAINT and his co-conspirators made calls to ADP for copies of the businesses' payroll records so they could apply for the PPP loans to be forgiven.  An analysis of the records of the businesses opened at ADP by PHILOSSAINT and his co-conspirators showed that: (a) many of the PPP loans were for the exact same dollar amount; (b) many of the businesses had the same employees on their payrolls purportedly working full-time at multiple businesses simultaneously; (c) many of the employee paychecks were whole dollar amounts (e.g., $2,000.00); (d) many employee payroll checks were direct-deposited into accounts belonging to the owner of the business, rather than into accounts belonging to the employee; and (e) some employees who worked for businesses onboarded by PHILOSSAINT and his co-conspirators were simultaneously employed full-time for other long-standing ADP clients.  ADP's servers are located in Alpharetta, Georgia so PHILOSSAINT's and his co-conspirators' communications with ADP regarding

payroll services and to obtain payroll records in support of loan applications and loan forgiveness necessarily involved interstate wire communications.

### 2.   Use of Fabricated Tax Returns

19.     To obtain the PPP and EIDL loans and to increase the dollar amount of those loans, the co-conspirators grossly inflated the number of employees and monthly payroll costs claimed on the loan applications and submitted fabricated tax returns in support of the applications. According to IRS records, prior to receiving the PPP and EIDL loans, the members of the conspiracy did not file IRS Forms 941 for their businesses; thus, the IRS Form 941's submitted in support of the loan applications were falsified.  Similarly, the Florida Department of Revenue's wage and earnings records do not reflect the payroll amounts claimed on the businesses' PPP loan applications.

### 3.   Identical Documents and Common IP Address

20.     In addition to using the same *modus operandi* of creating ADP payroll accounts to create the appearance of having regular employees, using the stolen identities of family members and friends, and creating and submitting falsified IRS documents, a comparison of the falsified IRS documents and loan applications across members of the conspiracy showed that many of the falsified IRS documents contained the identical information.  For example, two IRS Forms 941 submitted by two businesses that had nothing in common (other than their link to PHILOSSAINT and EIVC), had the same: number of employees; wages, tips, and other compensation; federal income tax withheld; taxable Social Security and Medicare wages; taxes before and after adjustments; and total balance due – for *four consecutive quarters*.

21.     In addition, it was determined that many of the PPP and EIDL loans were applied for from the same IP address and device.

4.  <u>Recruiting Others Through the Payments of Kickbacks and Discounts</u>

22.     As explained in further detail below, PHILOSSAINT applied for and received PPP and EIDL loans on behalf of businesses owned by himself and his fiancée, M.T.  PHILOSSAINT also assisted co-conspirators in obtaining PPP and EIDL loans through EIVC's payroll coordination services and creating fraudulent payroll and tax documents.  In exchange for this, PHILOSSAINT and his co-conspirators agreed that the co-conspirators would pay PHILOSSAINT approximately 10% of the value of the loan received for his assistance in setting up the false payroll accounts and tax documents.

23.     Members of the conspiracy could receive "referral credits," i.e., payments, or discounts on the 10% that was owed, if they referred others to PHILOSSAINT to apply for PPP and/or EIDL loans.  Once the PPP or EIDL application was funded, the referrer received a discount on what they owed, or he/she received a referral credit paid out by check from PHILOSSAINT.

5.  <u>Laundering of Proceeds</u>

24.     Records from PHILOSSAINT's bank accounts showed that PHILOSSAINT received multiple checks and/or wire payments from the co-conspirators' businesses that, according to SBA records, received PPP and EIDL loans.  ADP records reflected the businesses were listed as clients under PHILOSSAINT's ADP firm, EIVC.  After receiving the loans, that is, the proceeds of the wire fraud scheme, the businesses sent payments, approximately 10% of the loan value, via check or wire to PHILOSSAINT.  To promote the carrying on of the fraud scheme, and knowing that the transaction was designed to conceal the nature, source, ownership, or control of the proceeds of the fraudulent PPP/EIDL loan scheme, PHILOSSAINT instructed his co-conspirators to separate the kickback payment over multiple checks and put phrases such as, "advertising", "commission", "payroll" or "advertisement" in the memo line of the check.  The

payments from the co-conspirators to PHILOSSAINT were the 10% kickback payment PHILOSSAINT required to assist in manufacturing the fraudulent payroll and tax documents and to facilitate the loans, not a business advertisement fee.

25.     In order to further conceal the nature, source, ownership, or control of the proceeds, PHILOSSAINT deposited the checks, on different days, into various bank accounts he controlled. For example, Company 4 ("COMPANY 4") received a PPP loan in the amount of $143,455.00 on February 23, 2021. On March 1, 2021, COMPANY 4 wrote four separate checks, check numbers 1122, 1123, 1124 and 1125, totaling $16,842.00, just over 10% of the overall loan value. Between March 8, 2021 and March 26, 2021, PHILOSSAINT deposited the checks between two separate bank accounts he was the signatory of. On March 8, 2021, PHILOSSAINT deposited check number 1125 into PNC bank ("PNC") account ending in 3583. On March 12, 2021, PHILOSSAINT deposited check number 1124 into Synovus bank ("SYNOVUS") account ending in 4266. On March 26, 2021, PHILOSSAINT deposited check numbers 1122 and 1123 into SYNOVUS bank account ending in 4266. COMPANY 4 received a second PPP loan on May 5, 2021 in the amount of $143,447.00 and wrote four separate checks, check numbers 1289, 1290, 1291 and 1292, totaling $15,845.00, just over 10% of the overall loan value. On May 19, 2021, PHILOSSAINT deposited the checks between two separate bank accounts he was the signatory of. Check numbers 1290 and 1291 were deposited into the SYNOVUS bank account ending in 4274. Check numbers 1289 and 1292 were deposited into the SYNOVUS bank account ending in 4241.

26.     PHILOSSAINT opened and operated more than eight bank accounts, across different banking institutions, using various company names, all in an effort to conceal and transfer the money he received as proceeds of the fraud.

27.    The below table reflects an example of at-least six businesses, which PHILOSSAINT and co-conspirators submitted PPP and EIDL applications on behalf of and created ADP payroll accounts for.

| Entity Receiving Loan and Sending Wire | Loan Date | EIDL/PPP Loan Amount | Check/Wire Date | Check Number | Check/Wire Amount |
|---|---|---|---|---|---|
| Company 1 | 2/17/2021 | Loan 1 $143,412.00 | 2/22/2021 | 6625902791 | $10,000.00 |
| Company 2 | 2/17/2021 | Loan 1 $143,222.00 | 2/22/2021 | 1023920902 | $10,000.00 |
| Company 3 | 2/20/2021 | Loan 1 $81,952.00 | 3/12/2021 | 1017 | $5,597.00 |
| Company 4 | 2/20/2021 | Loan 1 $143,445.00 | 3/1/2021<br>3/1/2021<br>3/1/2021 | 1122<br>1123<br>1125 | $2,500.00<br>$2,500.00<br>$5,920.00<br>(Total: $10,920.00) |
| Company 5 | 2/23/2021 | Loan 1 $142,840.00 | 3/12/2021<br>3/12/2021<br>3/25/2021<br>3/25/2021 | 2540<br>2541<br>2542<br>2543 | $6,784.00<br>$5,000.00<br>$2,500.00<br>$2,500.00<br>(Total: $16,784.00) |
| Company 6 | 4/9/2021 | Loan 1 $104,166.67 | 4/28/2021<br>4/28/2021<br>5/17/2021<br>6/29/2021 | 1060<br>1063<br>1064<br>1066 | $2,500.00<br>$3,000.00<br>$2,500.00<br>$2,416.70<br>(Total: $10,416.70) |
| Company 5 | 5/3/2021 | Loan 2 $143,447.00 | 5/13/2021<br>5/13/2021<br>5/17/2021<br>5/18/2021 | 2545<br>2546<br>2547<br>2548 | $4,344.70<br>$5,000.00<br>$2,500.00<br>$2,500.00<br>(Total: $14,344.70) |
| Company 4 | 5/5/2021 | Loan 2 $143,447.00 | 5/18/2021<br>5/18/2021<br>5/18/2021<br>5/18/2021 | 1289<br>1290<br>1291<br>1292 | $4,445.00<br>$2,500.00<br>$4,900.00<br>$4,000.00<br>(Total: $15,845.00) |
| Company 2 | 5/6/2021 | Loan 2 $143,447.00 | 5/17/2021 | 1017 | $10,000.00 |
| Company 1 | 5/6/2021 | Loan 2 $143,447.00 | 5/18/2021 | WIRE | $7,300.00 |

### Fraudulent PPP and EIDL Applications Submitted for PHILOSSAINT's Companies

28.    On April 1, 2020, PHILOSSAINT applied for an EIDL loan from the SBA as owner of the business entity named Royal Elite Trans LLC.  The application, which was submitted

through the SBA online portal, resulted in a total of $299,400.00 in loan proceeds, all of which was approved and disbursed into Bank of America ("BOA") account ending in 0080 in the name of "Royal Elite Trans, LLC". PHILOSSAINT is the sole signatory on this account. According to BOA records, the BOA account ending in 0080 was opened in April of 2018 with the listed title, "Royal Elite Trans LLC."

29.     According to the Florida Department of State records, on January 4, 2018, PHILOSSAINT incorporated Royal Elite Trans LLC with the principal office address at 270 NE 89th St, El Portal, FL 33138. PHILOSSAINT is the sole registered agent of Royal Elite Trans, LLC. In 2019, the principal place of business was updated to 1000 West Pembroke Road, 320, Hallandale Beach, FL 33009. This address is a Megacenter Self Storage facility, not an office. Royal Elite Trans, LLC rented the space as a "virtual office." A virtual office is part of the flexible workspace industry that provides businesses with a combination of service, space, and/or technology, without those businesses bearing the capital expenses of owning or leasing a traditional office. Although Royal Elite Trans LLC claims to be a limousine company, there are no limousines registered to the business, nor does PHILOSSAINT have a commercial driver's license.

30.     According to Internal Revenue Service ("IRS") records, Royal Elite Trans LLC filed as a Sole Proprietorship which used Form Schedule C (titled "Profit or Loss From Business") on Form 1040 (titled "U.S. Individual Income Tax Return") to report income or loss from the business. IRS records indicate Royal Elite Trans filed a Schedule C for tax year 2019 but did not file a Schedule C for tax years 2020 or 2021 reporting income or loss. Royal Elite Trans did not file IRS Form 941 (titled "Employer's Quarterly Federal Tax Return") for tax year 2019 to reflect the wages reported on their 2019 Schedule C.

31.     The Florida Department of Revenue, does not possess any wage and earnings records for Royal Elite Trans for tax year 2019, quarters 1, 3, and 4 of 2020, or tax year 2021 – in other words, PHILOSSAINT did not report to the State of Florida that Royal Elite Trans had any employees during all of 2019, quarters 1, 3, and 4 of 2020, and all of 2021.  Florida Department of Revenue records reflect wages of $500.00 paid to one employee, JOFF PHILOSSAINT, for the second quarter of tax year 2020 only.

32.     On or about April 1, 2020, PHILOSSAINT electronically filed an application for an EIDL with the SBA, falsely asserting that Royal Elite Trans had two employees, gross revenues of $130,000 for the 12 months ending 12-31-2020, and cost of goods sold for that period of $101,200.  Based upon the false statements in that application, SBA approved an advance of $2,000, which was transferred via wire into the Royal Elite Trans Bank of America account ending in 0080 on or about April 22, 2020.

33.     On or about April 9, 2020, PHILOSSAINT electronically filed an application for a PPP loan with Bank of America, falsely asserting that Royal Elite Trans had two employees and monthly payroll expenses of $7,000.00 per month.  In support of the Royal Elite Trans application, PHILOSSAINT submitted a counterfeit 1099 for tax year 2019, that is, IRS records reflect $0 in 1099 income for PHILOSSAINT for the tax year 2019.  Based upon the false statements in that application, Bank of America approved the application on or about May 1, 2020, and a loan in the amount of $2,536.00 was transferred via wire into the Royal Elite Trans Bank of America account ending in 0778 on or about May 4, 2020.

34.     On or about March 10, 2021, PHILOSSAINT electronically filed an application for a PPP loan with Cross River Bank, falsely asserting that Royal Elite Trans had average monthly payroll expenses of $8,333.00.  In support of the Royal Elite Trans application, PHILOSSAINT

submitted his 2019 individual tax return, 1040, which included a schedule C for Royal Elite Trans. According to the 1040 Schedule C, the wages listed for the tax year 2019, reflect a total of $23,500.00 which would equate to $1,958.33 in monthly payroll, not the $8,333.00 stated on the application. Additionally, IRS records reflect no Forms W2 issued by Royal Elite Trans for tax year 2019. Based upon the false statement that PHILOSSAINT submitted in support of the application, Cross River Bank approved the application on or about March 15, 2021, and a loan in the amount of $20,833.00 was transferred via wire into the Royal Elite Trans Bank of America account ending in 0080 on or about March 17, 2021.

35.    On or about February 24, 2021, PHILOSSAINT electronically filed an application for an EIDL advance with the SBA, falsely asserting that Royal Elite Trans had eleven employees and gross receipts of $58,391.00 in fiscal year 2020. IRS records and Florida Department of Revenue records reflect only one employee for the tax year 2020. According to IRS records, Royal Elite Trans did not file a schedule C for tax year 2020, that is, the $58,391.00 in gross receipts PHILOSSAINT listed on the application were never reported to the IRS. Based upon the false statements, SBA approved an advance of $8,000, which was transferred via wire into the Royal Elite Trans Bank of America account ending in 0080 on or about July 6, 2021.

36.    Between July 2021 and December 2021, SBA advised PHILOSSAINT that his application for an EIDL loan on behalf of Royal Elite Trans was denied. PHILOSSAINT sought repeated appeals to get more loan money. Based on PHILOSSAINT's false statements and false documents, the SBA approved an EIDL loan of $289,400, which was transferred via wire into the Royal Elite Trans Bank of America account ending in 0080 on or about December 21, 2021. Additionally, the EIDL application for Royal Elite Trans was related by device / IP address with 68 other PPP / EIDL applications.

### *Fraudulent PPP and EIDL Applications Submitted for Companies related to PHILOSSAINT's Fiancée*

37.    A review of bank records, ADP records, SBA records, travel records, public records, and interviews have identified M.T. as PHILOSSAINT's fiancée and one of the members of the conspiracy.

### 1.    CINDA FOUNDATION EIDL Application

38.    One of the companies that EIVC on-boarded with ADP was CINDA FOUNDATION INC. ("CINDA FOUNDATION").    M.T.'s mother is listed on Florida Department of State records as the president of CINDA FOUNDATION, but, as noted below, on at least one loan application, M.T. stated that she was the owner of the business.  ADP records revealed CINDA FOUNDATION created payroll accounts for four employees, M.T., D.D., O.F. and N.T., all of whom have been identified as family members of M.T.  The pay periods associated with the payroll began in April of 2021 and ended in September of 2021.  ADP records indicate the payroll checks written to D.F. and O.F. were deposited into M.T.'s Chase bank account ending in 6299.  Additionally, payroll earnings for M.T. and N.T. were direct-deposited into Chase bank account ending in 3281, an account M.T. is the signatory of.  An interview with purported employee N.T., revealed N.T. was never an employee for CINDA FOUNDATION, never received payment from CINDA FOUNDATION, and never gave permission for M.T. or PHILOSSAINT to use N.T.'s means of identification.

39.    On November 18, 2020, M.T. electronically applied for a SBA EIDL as owner of the business entity, Cinda Foundation Inc ("CINDA FOUNDATION").  The application, which was submitted through the SBA online portal, contained multiple false statements as outlined below.

40.    According to Florida Department of State records, on August 24, 2010, D.F.

("D.F") incorporated CINDA FOUNDATION, EIN 27-3302591, as a Florida Not For Profit Corporation with the principal office address at 2529 Hikers Court, Kissimmee, FL 34743. D.F. has been identified as M.T.'s mother.  On January 31, 2016, CINDA FOUNDATION was reinstated, the principal address was changed to 4251 SW 139th Avenue, Miramar, FL 33027.  The address is a lot in a residential neighborhood with a registered owner of Quality Farmhouse Investment LLC according to the Broward County Property Appraiser's records.  Surveillance revealed no signage or activity indicating the presence of a charitable foundation.  The records list M.T. as the treasurer or trustee and O.F. ("O.F.") as the Vice President.

41.     On the EIDL application, M.T. was listed as the authorized representative and 100% owner of CINDA FOUNDATION.  According to Florida Department of State records, D.F. is the president and owner of CINDA FOUNDATION, not M.T.

42.     The address listed on the EIDL application for CINDA FOUNDATION was 4251 SW 139th Avenue, Miramar, FL 33027.  As noted above, surveillance and public records show that the property is not owned by CINDA FOUNDATION, D.F., or M.T., and no charitable foundation is operating out of that residential property.

43.     On the EIDL application, M.T. falsely asserted that CINDA FOUNDATION was an S-Corporation and stated "No", when asked if the applicant was a Non-Profit Organization. The Florida Department of State lists CINDA FOUNDATION as a Florida not-for profit corporation.  According to Internal Revenue Service ("IRS") records, CINDA FOUNDATION files as a tax-exempt organization which uses Form 990 (titled "Return of Organization Exempt from Income Tax" and/or Form 990-N (titled "Electronic Notice (e-Postcard)").  Typically, small tax-exempt organizations that have an annual reporting requirement and generate annual gross receipts of $50,000.00 or less can satisfy the requirements by submitting Form 990-N.

44.     On the EIDL application, M.T. claimed CINDA FOUNDATION generated gross revenues of $238,254.00 for the twelve months prior to the date of the disaster (January 31, 2020). The IRS does not possess any S-Corporation records for CINDA FOUNDATION for tax year 2019, only Form 990-N, which is used for tax exempt organizations with gross receipts as $50,000.00 or less.

45.     On the EIDL application, M.T. claimed CINDA FOUNDATION had 5 employees as of January 31, 2020.   The Florida Department of Revenue has no record of CINDA FOUNDATION paying employee wages for tax year 2019 or 2020, thus the employee number was fabricated.

## 2.     FERRO'S EIDL Application

46.     On July 22, 2020, O.F., who has been identified as M.T.'s stepfather, received a SBA EIDL for Ferro's Entertainment and Production LLC ("FERRO'S").   On July 27, 2020, $72,800.00 was electronically funded into Popular Bank account ending in 3145, an account O.F. is an authorized signatory of.  The same day, a wire in the amount of $70,800.00 was sent to M.T.'s Chase bank account ending in 6299, with the remark "Investment working capital for law firm." Per the SBA guidelines, the proceeds from an EIDL are to be used as working capital of the established business that received the loan; not to start a new business or expand a different business.  Pursuant to the provisions governing the EIDL program, loan proceeds must be used by the business that received the loan on certain permissible expenses.  The EIDL (working capital) loans may only be used by the afflicted business, which must have existed in an operational condition on February 1, 2020, to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the COVID-19 disaster not occurred.

47.     According to Florida Department of State records, Ferro's Entertainment &

Production LLC was incorporated on December 12, 2016 by O.F. as the sole registered agent. FERRO'S principal place of business is listed as 4251 SW 139th Ave, Miramar, FL 33027 – the same address listed for CINDA FOUNDATION.  Surveillance and public records show that the property is not owned by FERRO'S, O.F., or M.T., and no "entertainment and production" company is operating out of that residential property.

48.     After filing an Annual Report on April 26, 2017, FERRO'S was dormant until the entity was re-instated on July 28, 2020 – after the start of the pandemic and after the EIDL application was submitted and funded – with the registered agent updated to M.T.  Also, D.F. (M.T.'s mother) was added as vice-president of the entity on February 1, 2021.  The principal place of business for the entity was updated on February 1, 2022 to 5365 SW 155 Ave, Miramar FL 33027, which is M.T.'s residential address.  Additionally, the Florida Department of Revenue has no record of FERRO'S paying any employee wages.

### 3.     CINDA FOUNDATION PPP Application

49.     On or around February 15, 2021, a PPP loan application for CINDA FOUNDATION was electronically filed through Cross River Bank ("CRB").  On or around April 7, 2021, a total of $104,166.67 was funded electronically into D.F.'s Popular Community Bank ("PCB") account ending in 6917.  D.F. is the authorized signatory of this account.  The PPP loan application listed D.F. as the 100% owner and authorized representative of the applicant business. The application contained multiple false statements as outlined below.

50.     According to Florida Department of State records, on August 24, 2010, D.F. incorporated CINDA FOUNDATION, EIN 27-3302591, as a Florida Not For Profit Corporation with the principal office address at 2529 Hikers Court, Kissimmee, FL 34743.  On January 31, 2016, CINDA FOUNDATION was reinstated, the principal address was changed to 4251 SW

139th Avenue, Miramar, FL 33027.  The records list M.T. as the treasurer or trustee and O.F. as the Vice President.

51.     CINDA FOUNDATION's PPP loan application claimed to have five employees and monthly payroll of approximately $57,168.00.  IRS records reflect no quarterly employee wage documentation (Forms 941 titled "Employer's Quarterly Federal Tax Return") for CINDA FOUNDATION for tax years 2019 and 2020.  Additionally, the Florida Department of Revenue does not possess any wage and earnings records for CINDA FOUNDATION for tax years 2019 and 2020, thus the employee and payroll numbers were fabricated.

52.     The address listed on the PPP loan application for CINDA FOUNDATION was 4251 SW 139th Avenue, Miramar, Florida 33027.  As noted above, physical surveillance showed that the foundation was not operating out of that address.

53.     In support of the PPP loan application for CINDA FOUNDATION, counterfeit IRS forms were submitted—that is, documents that were never submitted to the IRS, but instead were created to support the approval of the PPP loan application.  CINDA FOUNDATION submitted four counterfeit Forms 941 with their PPP loan application for quarters one through four of tax year 2020.  According to IRS records, CINDA FOUNDATION did not file employee wage documentation (Forms 941) for tax years 2018 through 2020.  Additionally, the 2020 Forms 941 CINDA FOUNDATION submitted with their PPP loan application are identical to Forms 941 submitted by at least three other corporations that also worked with PHILOSSAINT in preparing PPP loan applications, except for the EIN, corporate name, address, quarter, and federal income tax withheld.

54.     ADP records revealed CINDA FOUNDATION created payroll accounts for four purported employees, M.T., D.D., O.F. and N.T., all of whom have been identified as family

members of M.T.  The pay periods associated with the payroll began in April 2021 and ended in September 2021.  Bank records for CINDA FOUNDATION revealed no prior employee or payroll transaction before receiving the PPP loan.  The ADP payroll account was created to facilitate the scheme and make the businesses look legitimate in order to receive loan forgiveness.

55.     On or around September 24, 2021, CINDA FOUNDATION submitted SBA Form 3508S (titled "PPP Loan Forgiveness Form"), which asserted that $65,353.80 of the total funded PPP loan amount of $104,166.67 was spent on CINDA FOUNDATION's payroll costs for five employees.  The Florida Department of Revenue records list total wages paid of $27,230.75 for only four employees, for the second quarter of tax year 2021 only.  The Florida Department of Revenue does not possess any wage and earnings records for CINDA FOUNDATION for quarters one, three, and four of tax year 2021.

56.     ADP records indicate the payroll checks written to D.F. and O.F. were deposited into M.T.'s Chase bank account ending in 6299.  Additionally, payroll earnings for M.T. and N.T. were direct-deposited into Chase bank account ending in 3281, an account M.T. is the signatory of.  An interview with purported employee N.T., revealed N.T. was never an employee for CINDA FOUNDATION, never received payment from CINDA FOUNDATION, and never gave permission for M.T., PHILOSSAINT, or anyone else to use N.T.'s means of identification for any purpose, including in furtherance of the wire fraud scheme.

57.     After obtaining the loan proceeds, M.T. and J.P. received $21,416.70.  Six checks from the CINDA FOUNDATION Popular Bank account ending in 6917 were written to EIVC and M.T.  Between April 15, 2021 and June 29, 2021, check numbers 1060, 1063, 1064 and 1066, totaling $10,416.70 – that is, exactly 10% of the loan's value, were deposited into EIVC bank accounts ending in 6361 and 4241.  Check numbers, 1062 and 1067, totaling $11,000.00, were

deposited into M.T.'s Chase bank accounts ending in 6299 and 6300.

58.     CINDA FOUNDATION did not use the loan proceeds toward business expenses. On SBA Form 2483, the applicant certifies that the loan proceeds would be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, cover operations expenditures, covered property damage costs, covered supplier cost, and covered work protection expenditures as specified under the Paycheck Protection Program Rules.  The applicant further certifies that he/she understands that if the funds are knowingly used for unauthorized purposes, the federal government may hold the applicant legally liable, such as for charges of fraud.

### *PHILOSSAINT's Movement of Loan Proceeds*

59.     After fraudulently obtaining the EIDL proceeds, PHILOSSAINT attempted to conceal the fact that he was not using the loan proceeds towards business expenses by moving the funds between various bank accounts belonging to himself and his fiancée, M.T., who further facilitated the scheme by wiring the funds to international bank accounts naming PHILOSSAINT as the recipient.  Driver's license records show that PHILOSSAINT and M.T. share the same residence.  Recent surveillance also shows that Royal Elite Trans and M.T.'s businesses are in the same location.

60.     On December 20, 2021, the Royal Elite Trans BOA account ending in 0080 had a balance of $2,039.50.  On December 21, 2021, the account balance increased to $291,439.50 after the EIDL disbursement was electronically deposited.  A review of the transactions following the EIDL deposit revealed PHILOSSAINT did not use the loan proceeds to support his business. Instead, PHILOSSAINT and M.T. transferred money from the loan to other bank accounts for personal use, as outlined below.

61.     On December 21, 2021, PHILOSSAINT completed two separate Zelle account

transfers totaling $10,000.00 to another bank account under his name.

62.    Between December 22, 2021 and January 20, 2022, PHILOSSAINT sent in total $264,325.07 through Zelle, checks, and wire payments to accounts controlled by M.T.

   a.   December 22, 2021, BOA account ending in 0080 check #283 in the amount of $34,000.00, was deposited into Chase bank account ending in 6299. Chase records show M.T. is the sole authorized signatory of this account.

   b.   December 22, 2021, BOA account ending in 0080 check #284 in the amount of $6,573.63, was deposited into Chase bank account ending in 3281. Chase records show this is a joint checking account listing M.T. and D.M.F. as authorized signatories.  D.M.F. is a relative of M.T.

   c.   On January 5, 2022, a wire in the amount of $26,371.30 from Royal Elite's BOA account ending in 0080 was deposited in Chase account ending in 1969. Chase records show M.T. is the sole authorized signatory of this account.

   d.   On January 18, 2022, a Zelle payment in the amount of $7,380.14 from Royal Elite's BOA 0080 account was sent to M.T.'s Chase account ending in 6299.

   e.   On January 20, 2022, a wire in the amount of $190,000.00 from Royal Elite's BOA account ending in 0080 was deposited into M.T.'s Chase account ending in 1969.

63.    A review of M.T's accounts reflect that, once she received the wires from PHILOSSAINT, M.T. sent international wires to a bank account in the Dominican Republic that listed JOFF PHILOSSAINT as the recipient.

64.    The day after the deposit of $26,371.30 from Royal Elite's BOA account ending in 0080 into M.T.'s Chase account 1969 on January 5, 2022, M.T. submitted an international wire in the amount of $26,371.30 to JOFF PHILOSSAINT's Dominican Republic bank account.

65.     Following the January 20, 2022, deposit of $190,000.00 from Royal Elite's BOA account ending in 0080 into M.T.'s Chase bank account ending in 1969, on January 25, 2022, M.T. submitted an international wire in the amount of $200,000.00 to JOFF PHILOSSAINT's Dominican Republic bank account.

### *PHILOSSAINT's Naturalization Fraud*

66.     On or about February 24, 2020, in Miami-Dade County, in the Southern District of Florida, PHILOSSAINT, who was born in Haiti and was a Haitian citizen, applied to naturalize as a United States citizen.  Specifically, PHILOSSAINT submitted an Application for Naturalization (Form N-400) to the Hialeah, Florida, office of the United States Citizen and Immigration Services. PHILOSSAINT affirmed his application under the penalty of perjury that it was true and correct.

67.     On or about December 15, 2020, in Miami-Dade County, in the Southern District of Florida, PHILOSSAINT appeared before a naturalization examiner for an interview based on his previously submitted Form N-400 Application.  He was then placed under oath and affirmed under penalty of perjury that the statements he had earlier provided on the N-400 form were still true and correct.   During that time, PHILOSSAINT was given an opportunity to change any of the answers he had previously provided on the N-400 if in fact, they were no longer true.

68.     On his Form N-400 Application at Part 12, Question 22, and in his subsequent interview under oath, PHILOSSAINT stated that he had never, "committed, assisted in committing, or attempted to commit, a crime or offense" for which he had not been arrested, when in truth and in fact, and as PHILOSSAINT then and there knew during his interview, he had committed crimes for which he had not been arrested in the ten month time period following the submission of his N-400, but before his naturalization interview, that is, the crimes described in this affidavit, and related offenses.

69.     On his Form N-400 Application at Part 12, Question 30 (i), and in his subsequent interview under oath, PHILOSSAINT stated that he had never, "Made any misrepresentation to obtain any public benefit in the United States" when in truth and in fact, and as PHILOSSAINT then and there knew at his naturalization interview, that following the submission of his N-400 and before his naturalization interview, he had misrepresented businesses, their earnings, and their employee workforce in an effort to obtain multiple United States Covid-19 Disaster Loans.

70.     On his Form N-400 Application at Part 12, Question 31, and in his subsequent interview under oath, PHILOSSAINT stated that he had never, "given any U.S. Government officials any information or documentation that was false, fraudulent, or misleading" when in truth and in fact, and as PHILOSSAINT knew then and there at his naturalization interview, that following the submission of his N-400, but before his naturalization interview, he had misrepresented businesses, their earnings, and their employee workforce, including submitting fraudulent tax returns, to obtain multiple United States Covid-19 Disaster Loans.

71.     On February 9, 2021, PHILOSSAINT became a naturalized United States citizen in a ceremony conducted by the United States Citizen and Immigration Services in Hialeah, Florida.

72.     In an attempt to confirm that the naturalized JOFF PHILOSSAINT in question is the same JOFF PHILOSSAINT who applied for and received U.S. Covid Disaster Loans, a comparison was done of both applicant's identifying information.  In addition to the same name, JOFF PHILOSSAINT, being used by both applicants, the full Social Security Number, date of birth, and telephone number were given on both the N-400 and U.S. Covid Disaster Loan applications.

## CONCLUSION

73.     Based on the aforementioned information, I respectfully submit that there is probable cause to believe that JOFF PHILOSSAINT did:

a.      willfully, that is, with intent to further the object of the conspiracy, and knowingly combine, conspire, confederate, and agree with persons known and unknown to commit wire fraud, that is, to knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises and, for the purpose of executing such scheme, did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds; in violation of 18 U.S.C. § 1343, all in violation of Title 18, United States Code, Section 1349;

b.      knowingly and willfully conspire with persons known and unknown to: (i) conduct a financial transaction affecting interstate and foreign commerce involving the proceeds of specified unlawful activity (wire fraud), knowing that the property involved in the transaction represented the proceeds of some form and unlawful activity, and knowing that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and (ii) transmit, and transfer monetary instruments and funds, from a place in the United States to and through a place outside the United States, knowing that the monetary instruments and funds represented the proceeds of some form of unlawful activity and knowing that such transmission and transfer was designed in whole or part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity (wire fraud), in violation of 18 U.S.C. § 1956(a)(2)(B)(i); and (iii) engage in monetary transactions by, through, and to financial institutions affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000 that is derived from specified unlawful activity (wire fraud), in violation of 18 U.S.C. § 1957; all in violation of Title 18, United States Code, Section 1956(h);

c.      knowingly transfer, possess, and use, without lawful authority, the means of identification of another person, during and in relation to a felony violation of 18 U.S.C. § 1343, all in violation of Title 18, United States Code, §§ 1028A(a)(1) and 2; and

      d.      knowingly procure, contrary to law, naturalization as a United States citizen for himself; in violation of Title 18, United States Code, Section 1425(a).

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

SPECIAL AGENT JON A. LONGO
HOMELAND SECURITY INVESTIGATIONS

Sworn and Attested to before me by Applicant by Telephone (Facetime)

pursuant to Fed. R. Crim. P. 3, 4(d), and 4.1 this _____ day of August, 2022.

BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE